[No. 11648.    Department One. — June 21, 1887.]

## JANE L. CONNOR, APPELLANT, *v.* LEE STANLEY, ADMINISTRATOR OF THE ESTATE OF WILLIAM JARVIS, DECEASED, RESPONDENT.

CONTRACT — INSANITY — UNDUE INFLUENCE — SPIRITUALISM — EVIDENCE — FINDINGS. — The action was brought to enforce a contract entered into between the plaintiff and one Jarvis, the defendant's intestate. The defense was that at the time of making the contract Jarvis was insane, and that the contract was procured by the use of undue influence by the plaintiff. The court found that at the time the contract was executed Jarvis was insane on the subject of spiritualism, and that the plaintiff, who was a spiritual medium, had taken advantage of his weak and unsound mind in procuring the contract to be executed. On a review of the evidence, *held*, that the findings were sustained.

ID. — RELATION BETWEEN SPIRITUALIST AND MEDIUM — CONTRACT BETWEEN — PRESUMPTION OF UNDUE INFLUENCE — BURDEN OF PROOF. — The relation existing between a person who is a firm believer in spiritualism, and the medium upon whose spiritual manifestations he habitually relies, is one of personal confidence, and all contracts between them, by which the medium obtains an advantage, are presumed to have been procured through the undue influence of the latter. And in an action to enforce such a contract, the burden is cast upon the medium of overcoming the presumption by showing that there was no undue influence.

APPEAL from a judgment of the Superior Court of Sacramento County, and from an order refusing a new trial.

On the 21st of June, 1882, the plaintiff and one William Jarvis entered into an antenuptial contract, whereby they mutually agreed to marry each other, and which contained a grant to the plaintiff of ten thousand dollars' worth of the bonds of the Natoma Water and Mining Company, which Jarvis promised to deliver to her on or before the day of their marriage. Jarvis died in 1882, having previously refused to marry the plaintiff, and continuing his refusal down to the time of his death. The action was brought against his administrator to re-.cover the value of the bonds. The further facts are stated in the opinion of the court.

*Robert T. Devlin, W. H. Beatty,* and *A. P. Catlin,* for Appellant.

*Freeman & Bates,* and *G. L. Johnson,* for Respondent.

TEMPLE, J. — The contract on which this action is founded is set out in full on the former appeal. (65 Cal. 184.) It is there said to be valid as an antenuptial contract. The defendant set up as a defense that at the time the alleged contract was made his intestate was insane and incapable of entering into a contract, and that it was procured by the use of undue influence by the plaintiff.

The court found that all the allegations of the complaint were true, except as to the capacity of Jarvis to contract, and that all the affirmative matters set up in the answer were true, except that plaintiff and P. B. Nagle did not, nor did either of them, coerce Jarvis otherwise than by taking advantage of his weak and unsound mind.

The findings therefore plainly cover all the issues in the case, and the only question for our consideration is, whether there is any evidence which could justify the conclusion. Upon this proposition there can be no doubt.

1. There was evidence tending to prove insanity generally, and not merely that he was insane on the subject of spiritualism. J. Miller, an intimate acquaintance, thought he was insane. To the same effect is the testimony of Mrs. A. Walker, J. W. Houston, S. B. Lusk, and Lee Stanley, and it is shown that plaintiff herself stated that she believed him insane. And then there is much testimony as to facts which would tend to show an unsound mind.

2. There is much testimony tending to prove that Jarvis was insane on the subject of spiritualism. That there is such evidence is not controverted, but counsel indulge in a long argument, and cite many authorities to the point, that a belief in spiritualism does not prove insanity. As an abstract proposition, no doubt this is so. The law pronounces no one insane for mere religious belief, no matter how unreasonable it may appear to the judge. But this does not meet the case made. A belief in the doctrines maintained by the Methodists, Presbyterians, or the Catholics would not establish insanity. Still, one might be a monomaniac as to either form of religion; and so as to spiritualism. And that is precisely the effect of the great mass of testimony in this case.

3. There is much evidence tending to show undue influence. It is established that the relation between the parties was confidential, in consequence of her claim to power as a medium, through which she had great control over him. This being established, the burden was cast upon her of showing that there was no undue influence. The rule applies with peculiar force to the relation of one and his priest, confessor, clergyman, or spiritual adviser, and certainly with no less force to the relation between

one who is a firm believer in, not to say a monomaniac upon, the subject of spiritualism, and the medium in whom he has confidence, and upon whom he habitually relies.

The cases upon the subject are numerous, but the law, so far as applicable here, is crystallized in the Civil Code. Section 2219 provides that every one who voluntarily assumes a relation of personal confidence with another is a trustee, and section 2235 raises the presumption that all transactions between such persons by which the person trusted obtains an advantage are entered into under undue influence. It becomes important, then, to inquire whether the relation did exist.

Jarvis was seventy-two years old, feeble both mentally and physically. He was a widower, his wife having died in August, 1881, a few months before the contract questioned here was entered into. He had lived for a great many years at Folsom, a quiet life, with no family except his wife. They had had one child, a daughter, who married the defendant, and died twenty years ago, leaving two children. Jarvis had been a music teacher, and had accumulated some property. He was for many years a firm believer in spiritualism. The belief had grown upon him, until, in the opinion of the witnesses, it had become a monomania. His mind would drift to the subject upon all occasions. He relied upon supposed spiritual advice in his business transactions. When warned against trusting certain persons, he said: " It will be all right in the next world; they are spiritualists." He sold a farm for two thousand dollars, to be paid for in installments of two hundred dollars a year without interest. He had been offered $250 a year rent. He said the spirits told him he must sell; that he was governed entirely by the spirits. The purchaser was a spiritualist. He invested several thousand dollars in mines, under the supposed advice of spirits. Most of

this money was lost. He offered a lady fifteen hundred dollars to attend seances and become a medium. To another lady he offered to convey a piece of land if she would become a medium. He believed he could reform all the convicts if he could get them to read a spiritualistic paper. He said he had got the right idea of spiritualism, and was going to publish a work which would astonish the world. He admitted that he was controlled by mediums.

One witness said he was a mental wreck from the time he lost his daughter, and there is much evidence that he became still worse after the death of his wife. His conduct was very strange during her last illness. He did not believe in giving her medicine or nourishment. The medium said she would die, and the spirits would keep her until then. He did not wish a doctor, as the spirits would do nothing if he had one. He objected to cooking being done in the house; the smell would keep the spirits out. The doors and windows must be left open so they could come in. He was angry when they gave her stimulants, because if she were to die intoxicated, she would remain so in the spirit land. He knew of one man who was killed while drunk, and who was still drunk fifteen years after his death.

In this condition of health, mental and physical, Jarvis met the plaintiff. She is said by her counsel to be an artist, who has a studio in San Francisco; a highly educated, refined, and accomplished lady. When Jarvis first made her acquaintance does not definitely appear, but it was evidently shortly after the death of his wife, when he went to consult her as a medium to find out how much money he should give his granddaughter to use. In February, after Mrs. Jarvis's death, plaintiff was giving seances at Folsom. Jarvis had induced her to go there to be developed as a medium, and gave her fifty dollars per month to come. She remained on these

terms for some three months, giving seances, which were attended by Jarvis, and to which he invited his friends. The evidence shows that he had the most exalted opinion of her powers as a medium, and that he was much under her control. He said himself that she had great influence over him when she was around. There is evidence that plaintiff herself said that she believed that Jarvis was crazy, and a medium could do anything in the world with him.

We think this is sufficient to show that there was evidence upon which the court could find the existence of a relation of a peculiar trust and confidence between them, similar to that between a religious devotee and his spiritual adviser, and the proof of which would throw upon the plaintiff the burden of showing fair dealing.

But the record contains evidence of undue influence and adverse pressure. Mrs. Walker testified: " Speaking of the time when the contract that is in suit here was executed, she said that they had had trouble and had words. She said that she wished him to settle something on her, and he asked her if she was afraid that he would not leave her anything, or would not leave her as well off as her other husband had left her, and she said that she locked the door and kept him in the room for about two hours, and that she put the key in her pocket. . . . . They talked about the matter in my presence, and they both told me that which I have stated. She said that they finally came to a settlement, and he agreed to settle something on her, and she opened the door and got a boy and sent him down to Nagle's office, and he came up and drew a draught of the contract that day, and the next day she told me that Jarvis came in and she asked him if he would have a chair, and she said he acted queerly. Then she said that she told him he would not have time to sit down if he was going down to keep his word and sign that contract. He asked her what contract, and he said, 'I have made no contract.'

. . . . She said that at that time he acted as if he was either drugged or crazy, and that he did not act as if he knew what he was about, and did not seem to know that he had ever drawn up a contract. . . . . She expressed herself as believing that he was an old fool, and did not know what he was about. She said at that time she believed that he was crazy."

There was evidence on the part of plaintiff contradicting some of this evidence, but this only creates a conflict. If we could consider the testimony, however, as a trial court, we could not say that the evidence does not sustain the finding.

Judgment and order affirmed.

McKINSTRY, J., and PATERSON, J., concurred.