## ESTATE OF DANIEL B. SPANGLER, DECEASED.

[No. 6243; decided May 28, 1888.]

**Insanity of Testator—Opinion of Witness.**—A witness called on behalf of the proponent of a will to prove the sanity of the testator, who is not an expert, is not qualified to give his opinion where he did not know that about the time of the execution of the will the testator had been adjudged dangerous to be at large, and was sent to the home of the inebriates, and shortly after to the state insane asylum; all he knew being based upon the fact that he never heard the testator's insanity questioned, and saw nothing particularly wrong about his mind.

**Insanity of Testator.**—Upon the Issue of Sanity Raised by a Contest to the probate of a will, the court is concerned only with the *fact* of insanity, whatever cause the insanity may have proceeded from being immaterial.

**Insanity of Testator.**—The Instrument Propounded as a Will should itself be considered in connection with other evidence, upon the issue of the testator's sanity.

**Insanity of Testator—Injustice of Will.**—Where the testator's estate was small, and he left nothing to his wife, who had been his spouse for twenty-five years, and was aged and infirm, remitting her to her community rights, but bequeathed all his estate to strangers, this fact may be considered as evidence in connection with other facts and testimony, upon the issue as to the insanity of testator.

**Insanity of Testator—When Established by Evidence.**—Where a will gives all the estate of the testator to strangers, remitting the widow to her community rights, the probate thereof should be de-

nied if it appears that the testator while young became insane and was confined to a straight-jacket for six months; that he had a brother and cousin who were insane; that he embraced spiritualism a few years before his death and did many strange things under alleged spiritualistic influences; that he had a great many peculiar beliefs; that less than a month after making his will he was sent to the home of inebriates as dangerously insane, and nine days thereafter was formally adjudged insane and sent to the state asylum.

Ash & Mathews, for the contestant.

W. H. Bodfish, for the proponents.

COFFEY, J. The sole issue in this controversy is the sanity of the testator. A paper, purporting to be a will made by Daniel B. Spangler, was filed in this court May 12, 1887, accompanied by a petition of H. H. Lynch, who is named in said instrument as executor, reciting that the testator died May 7, 1887, at Napa City, California, being a resident at the time of San Francisco, and leaving estate therein consisting of real and personal property of the aggregate value of about $6000. The testator left him surviving a wife, Catherine Spangler, but no children. At the time of making the will, February 17, 1887, the testator was about the age of fifty-four years. The operative items of the will are as follows:

"*First:* I declare that all the property which I now possess, both real and personal, is community property; therefore, my wife, Catherine Spangler, will be entitled, under the law, to the one-half thereof. I therefore make no further provision for her.

"*Secondly:* I give and bequeath to Mrs. Ella Lynch, wife of H. H. Lynch, now residing in the City and County of San Francisco, the sum of two thousand dollars.

"*Thirdly:* I give and bequeath to my friend, George T. Shaw, residing in said city and county, the sum of five hundred dollars.

"*Fourthly:* I give and bequeath to my friend, Charles Mead, of said city and county, the sum of two hundred and fifty dollars.

"*Fifthly:* I direct that my executors, hereinafter named, sell my real estate at such time as to them may seem best, and out of the proceeds thereof pay the several legatees the sums of money hereinabove named."

The widow contests the probate of the will upon the ground that at the date of its execution, and for a long time prior thereto, the testator was not of a sound and disposing mind, and not competent to make a will by reason of insanity; and the proponent denies the allegation of insanity, and avers that the testator, at the date of the execution of the will and prior thereto, was of sound and disposing mind and memory, and fully understood the nature and character of the document executed, and comprehended its contents, and executed the same of his own free will.

In support of the allegation of insanity there is an abundance of evidence. The testator died in the insane asylum at Napa, on the 7th of May, 1887; to which institution he had been committed on the 22d of March, having been apprehended for insanity on the 13th of March, and detained in the Home of the Inebriates, in San Francisco, from that time until his commitment to the State Asylum. There were present at the time of the commitment as witnesses and as spectators: George T. Shaw, W. H. Bodfish, Mr. and Mrs. Mead and Dr. McLaughlin. An examination was made by the physicians appointed by the court for that purpose, and it appears from the record certified to by them, and by the judge that Mr. Spangler had certain delusions, stated as follows: "He is a walking electric battery; has invented a code of signals; communes with the other world; can pump himself full of wind, which he can impart to others; wants to make a chimney of one of his teeth. First indications occurred about six months ago." This appears in the certificate attached to the commitment, and the record shows that the witnesses sworn and examined on that occasion were Dr. McLaughlin and George T. Shaw. The latter gentleman was named in the paper offered as a will as an executor, but renounced that trust. He appears in the will as a legatee for a small amount, and also appeared as a witness in support

of the will in the contest, at which time he testified substantially that he felt perfectly confident in the soundness of the testator's mind in regard to all business transactions at the time of the making of the will.

Mr. John F. Kennedy, a subscribing witness to the document, testified that at the time of that transaction in his judgment the testator was entirely sound of mind; he had never heard Mr. Spangler's sanity questioned.

Charles H. Mead, who is a legatee in the will, testified that on the morning of the making of the will, when the deceased called him to send for Mr. Lynch, Mr. Shaw and Mr. Bodfish, the witness never saw a more rational man in the whole world than he was.

Mrs. Adelaide Mead, wife of the last named gentleman, corroborated his evidence.

Mr. Bodfish, the attorney who drew the document offered by the proponent as the will of Daniel B. Spangler, testified that said Spangler was a client of his for several years before his death, that he saw him frequently about different matters of business; that he believed him to have been of sound and disposing mind at the time he signed the will, as he talked upon the subject matter of the will intelligently, gave him directions how to draw the will, and the will was dra~n in conformity with his directions. Twenty-five days elapsed from the date of the will, February 17, 1887, until the testator was committed to the home of the inebriates, March 13, 1887, on a charge of insanity, and nine days more elapsed until he was committed to the lunatic asylum, March 22, 1887.

The record shows that Dr. McLaughlin, a witness for contestant, and George T. Shaw, above referred to, a witness for the proponent, were sworn and examined, and that W. H. Bodfish and Mr. and Mrs. Mead, all witnesses for proponent, were present upon the occasion of the examination of testator. The complaint was made by Doctor Moses A. McLaughlin; and from his testimony, and that of George T. Shaw, witnesses who had frequent intercourse with the accused during the time of the alleged insanity, and upon the certificate of Doctors J. M. Eaton and E. Windele, graduates in medicine, and after a personal examination of the accused, and being him-

self satisfied the accused was committed by the judge to the insane asylum at Napa.

The certificate of the physicians sets forth that the attack from which he was suffering at the time of the examination first appeared about the 7th of February, ten days before the making of the will, and that other attacks occurred about six months previously.

This was the result of a judicial proceeding as recorded in the Book of Insane Commitments, Volume XV, Superior Court, folio 113. On that day he was solemnly adjudged to be an insane man, and there is no escape from the conclusion that four of the witnesses in behalf of the proponent believed, at that time and place, that the statements in the certificate of the examining physicians, and of the commitment, were the truth, and that the insane attack from which he suffered on March 22, 1887, first appeared February 7, 1887, and that there were other attacks six months previously, and that all of this period included the time at which he signed his name to the paper here propounded. It is clear that their opinion upon the 22d of March, 1887, was that this man was insane on the 7th of February, 1887, and that that insanity continued until the time of his commitment. If we conclude that their opinion when testifying as witnesses for the proponent was correct, we must reject the evidence elicited from them, or given in their presence, upon which the man was committed, as a dangerously insane lunatic, to the asylum on the 22d of March. Accepting either horn of the dilemma, their opinions as to the sanity of this man at the time he signed the instrument here propounded, as against the testimony for the contestants, must fall.

The remaining witness, Mr. Kennedy, was unquestionably honest in his testimony, but erroneous in his opinion, as to the sanity of this man. A careful examination of his testimony shows that his observation was not sufficient to justify the deduction that the decedent was of sound mind at the time of this transaction; he was called to the place where the instrument was executed through a telephone message from his partner, Mr. Shaw; he had very little conversation with the decedent; he may have talked casually with him about elec-

tricity at some time, but on the morning of the day that the paper was signed he had no conversation with him only to inquire after his health; the decedent did not ask the witness any questions, nor did the witness ask any questions of him, except to ask him how he was; the witness was present probably about an hour altogether, and all that he was doing was trying to dry his feet at the fire, having become wet on the way. Mr. Bodfish was there when the witness arrived; the witness was about to leave just after he asked him how he was, but Mr. Bodfish asked him to stay and witness the will, which he was then writing. The witness did not visit the deceased when he was at the home of the inebriates, nor was he present at the time he was committed to Napa, and did not know anything about those circumstances, and as witness never heard the man's sanity questioned, and did not see anything particularly wrong about his mind, he concluded that the decedent was all right, and he based his opinion upon these premises; but witness was not an expert, and it never entered his mind that decedent was all wrong. Clearly, Mr. Kennedy erred in his opinion of the mental condition of the decedent. The premises upon which he proceeded were quite insufficient to justify the conclusion that the decedent was sane, and he does not positively so declare; he simply assumed the sanity because he had never heard anything to the contrary and saw nothing particularly wrong about the man. It is unnecessary to enter into a minute analysis of the testimony for the contestants. It is sufficient to refer to the testimony as given in the transcript, much of which is of such a character that it would be neither palatable nor profitable to expose it in this opinion.

The following is, I think, a correct summary of the conduct, condition and record of Daniel B. Spangler, the decedent: When he was a young man he became insane and had to be confined in a straight-jacket for six months; his brother died while insane; he had a cousin who was insane; he embraced spiritualism a few years prior to his death; he attended meetings, would come home late at night; on some occasions he would complain of being too hot; he would get up at late hours of the night and go out into the yard and lie down with-

out any clothing, sometimes all night, and refused to go into the house; he would wake up at night screaming with fright, and tell his wife that he thought Lynch was going to kill him for something that took place between himself and Lynch's wife, and told his wife that he must leave the state for a while on account of the anticipated trouble with Lynch.

He voluntarily separated from his wife when he was taken sick, there being no cause therefor, and took up his residence in a lodging-house; told his acquaintances that he had struck something new, that he had received a communication from Judge Templeton (who had been dead for some years) to build a wagon of peculiar style to travel with in the country, by which he would make $1,000 per month; he told the physicians who attended him that he was being treated by mediums and spirits of a deceased person; he actually built the wagon at an expense of $800; he tried to extract one of his teeth with his fingers; he claimed to be heavily charged with electricity, tried to throw it off and communicate it to others by rubbing one hand rapidly down his arm and then take hold of the hand to give direct communication that way; he does not believe the physician's statement about his disease, but affirms that his gums are all honey-combed, and if he had a chimney in one of his teeth he would be all right. He is forgetful, and declares that he has taken medicine when he has not taken it, and refused to be convinced even when shown the box containing the medicine; he refused to take medicine until he received a communication to do so; he closed his eyes and told the person present to wait, he was getting a communication from Judge Templeton; he stated that Judge Templeton's spirit had control of him; he says he is treated by a certain woman, a medium, who tells him how much sexual intercourse he must have to rid himself of surplus electricity, he is restless, wandering in conversation, forgetful and sleepless; he refers to his favorite topic of conversation, spiritualism and electricity, on all occasions; it takes the most powerful opiate to quiet him; and his physical condition is failing rapidly, and his mental condition continually, and there is no hope for improvement in either. In this condi-

tion he was taken to the house of Mr. Mead on the seventh day of February, 1887; his condition does not improve, but continues to grow worse. A nurse is employed to attend him during the night. He complains of being too warm, directs the nurse to hold the bedclothing up so he can have what he calls a free circulation of air. He then makes great effort to relieve himself of electricity; he refuses medicine until he can get a communication whether to take it or not; he removed all his clothing and applied his person to the fire in a grate, declaring that his lungs had refused to pump air, and he must get them in order to do so; he refused to go to his bed until after he had received a communication to go. He talks on the subject of electricity and spiritualism continually; he sleeps but little and that sleep is a restless, muttering sleep. The nurse is with him only about a week, after which he is sent to the home of the inebriates, where the same evidences of insanity continue, and he is examined by the inquisitors in insanity, and committed to the asylum for the insane, where he died May 7, 1887, without any improvement or change in his mental or physical condition.

With the cause of the decedent's insanity the court is not concerned in this inquiry; it is the fact of insanity, from whatsoever cause it did proceed, and that fact is here clearly established. Dr. McLaughlin, who attended the deceased from August to October, 1886, while he was at the Tremont House, said he was there emaciated and suffering and weak; in the opinion of this doctor the decedent was insane; he was trying to drill a hole into one of his teeth and said that would cure him, and other things of the same class. At the time the decedent was examined on the charge of insanity he imagined himself a gasometer or an electrometer, on which account he expected to be employed by the government, on the Coast Survey. He was failing rapidly, especially mentally. Dr. Jewell, superintendent of the home of inebriates, testified that the decedent was insane while there. Dr. Castelhun, who called the day the will was made, testified that the decedent was very sick, that his brain was diseased and his mind was influenced thereby, and that the cause of the disease of the

brain was chronic alcoholism.   These are professional physicians of ability and experience and close observation of the particular subject.   They are more than ordinary experts; they testify directly to phenomena observed by themselves, aided by their special training to arrive at accurate results and correct opinion, and they are amply corroborated by the testimony of nine or ten other witnesses on the part of the contestants, including Dr. Brown, the physician who attended the witness at the Trenton House, up to February 18 to the 24, 1887; C. A. Bragdon, the nurse who attended him from February 18 to the 24, 1887, and the others.   The instrument propounded as a will should itself be considered in connection with other evidence.   It is not clear at all to my mind why the deceased should, in disposing of so small an estate, divert from the natural object of his bounty, an aged and afflicted wife, remitting her to her community rights.

In this case all legatees are strangers to the testator; there is no reason given why they should be considered in preference to the widow; and there was especial reason why she should be the recipient of his entire estate, because of her age and infirmity.   She had been his wife for twenty-five years, and no reason appearing to the contrary for discarding her, it was she, and not strangers, who should have his estate. The decision now announced was the one which the court was prepared to declare upon the submission of this cause, as was clearly intimated to the counsel for the proponents; but for the reason that the latter urgently asked of the court a studious consideration of the points presented by him and the authorities supporting them, and a further review of the testimony, the court has chosen to examine again and again the evidence so subtly analyzed, and the argument so ably presented by the counsel for proponents; but this reconsideration and re-examination of evidence, authorities and arguments serve solely to fortify the original opinion, orally intimated at the conclusion of the trial, that the decedent, Spangler, at the time he signed the instrument here propounded, and for a long time prior thereto, and subsequently until he died in the insane asylum, was mentally incapable of making a will;

and the instrument here propounded should be and it is hereby denied probate.

Let an order be entered accordingly.

---

The Internal Evidence of a will itself may be of great importance as indicating the testator's mental condition and soundness of mind: Estate of Dolbeer, 149 Cal. 227, 86 Pac. 695. ''If the testamentary disposition be in itself consistent with the situation of the testator, and in congruity with his affections and previous declarations; if it be such as might have been naturally expected from one so situated, this is in itself rational and legal evidence of no small weight to testamentary capacity, whilst the reverse will alone furnish occasion of doubt, demanding evidence to refute it. The rationality of the act goes to show the reason of the person'': Stewart v. Lispenard, 26 Wend. 255, 313, per Senator Verplanck, approved in Estate of Shafter, 35 Colo. 578, 117 Am. St. Rep. 216, 85 Pac. 688, 6 L. R. A., N. S., 575.

A Belief in Spiritualism is no evidence of insanity, although clearly one may be a monomaniac on that subject, just as he may be on any other: Connor v. Stanley, 72 Cal. 556, 1 Am. St. Rep. 84, 14 Pac. 306; Estate of Spencer, 96 Cal. 448, 31 Pac. 453; Owen v. Crumbaugh, 228 Ill. 380, 119 Am. St. Rep. 442, 81 N. E. 1044; Buchanan v. Pierie, 205 Pa. 123, 97 Am. St. Rep. 725, 54 Atl. 583; Orchardson v. Cofield, 171 Ill. 14, 63 Am. St. Rep. 211, 40 L. R. A. 256, and note to People v. Hubert, 63 Am. St. Rep. 91.

A Will is not Invalid Because It may Appear Unwise, Unjust, or unnatural in its provisions, for the law does not make the right of testamentary disposition dependent upon its judicious exercise. Nevertheless, the injustice or unnaturalness of a will is a circumstance which may be considered with other evidence tending to show, on the part of the testator, an unbalanced mind or a mind susceptible to or swayed by undue influence: 1 Ross on Probate Law and Practice, 64.