IN THE MATTER OF THE PROBATE OF THE WILL OF WILLIAM C. BISSELL, DECEASED.*

ORLAN THOMAS ET AL., APPELLANTS, V. NATIONAL CHRISTIAN ASSOCIATION OF ILLINOIS ET AL., APPELLEES.

FILED JANUARY 8, 1902. No. 10,834.

Commissioner's opinion, Department No. 3.

1. **Will:** EVIDENCE: FINDING. Evidence examined, and *held* to support the finding of the court that a testator was competent to make a will and a conveyance of property.

2. **Bequest:** ILLEGAL: IMMORAL: PUBLIC POLICY. One may will his property for the promotion of any object that is not illegal, immoral or against the public policy of the state.

3. **Conveyance in Trust:** ACTION BY HEIRS. In a suit to set aside a conveyance of real estate brought by the heirs of a deceased grantor the court upheld the conveyance, and found that it had been made in trust for certain purposes set out in the decree, and ordering the execution of the trust by the grantee named in the deed. *Held,* That, while this part of the findings and decree was outside the issues made by the pleadings, the heirs had no standing to complain of the same.

APPEAL from the district court for Richardson county. Heard below before LETTON, J. *Affirmed.*

*This case in 88 N. W. Rep., 683, appears as *Thomas v. National Christian Association of Illinois et al.*—REPORTER.

*I. E. Smith, Edwin Falloon, Samuel P. Davidson* and *Reavis & Reavis,* for appellants:

When confidential relations exist between the testator and legatee, such as guardian and ward, attorney and client, physician and patient, religious adviser and layman, and the like, opportunities outside the family relation for unduly influencing the mind of a testator create a grave suspicion that such influence was exercised; so that whenever it appears that the will was executed through the intervention of one occupying such relation to his especial advantage, the presumption of undue influence arises and the burden of proof devolves on such legatee to show affirmatively by a preponderance of the evidence that the transaction was fair in all respects. The rule has been construed to include a spiritualistic medium and believer in spiritualism who had been in the habit of consulting such medium. *Connor v. Stanley,* 72 Cal., 556.

A will is invalidated by a delusion, where it is the result of such delusion, but not otherwise, as a general rule. *Lucas v. Parsons,* 24 Ga., 640; *In re Cline's Will,* 24 Ore., 175, 41 Am. St. Rep., 851; *Pidcock v. Potter,* 68 Pa. St., 342, 8 Am. Rep., 181.

The bequest in this case was not a charitable one. *Jackson v. Phillips,* 14 Allen [Mass.], 539.

*Francis Martin* and *Clarence Gillespie, contra:*

The bequest in question was to an organization, one of whose objects was to oppose Freemasonry. Let us see whether opposition to Freemasonry is evidence of a delusion:

"Anti-Masons was the name of a political party in New York and other states, organized in 1827-28. It was the result of a remarkable excitement over the fate of William Morgan, a tailor of Batavia, New York, who was said to be about to publish or betray the secrets of the Masonic order of which he was a member. He disappeared suddenly, and his fate has never been satisfactorily explained.

There was a search, and he was traced to the Niagara river, near which it was discovered he had been temporarily in prison. The opponents of Freemasonry declared that he had been murdered and sunk in the river or lake. Legal inquiries followed, but proved nothing. At or about that time, the governor of the state was a Mason of the most advanced degrees, and probably a majority of all public officers were members of the order. A wild excitement grew up in Western New York, and the anti-Masonic party was formed, casting 33,000 votes in 1828, about 70,-000 and 128,000 in 1830, though many in the latter years were anti-Jackson men, without reference to Masonry. In 1832 the party nominated William Wirt for president, but carried only one state—Vermont. In 1835, through a democratic split, they elected the governor of Pennsylvania." Library of Universal Knowledge, vol. 1, p. 527. William Henry Seward, Lincoln's secretary of state, was an anti-Mason in 1828. Ibid, vol. 13, p. 383.

Arriving at age, in the midst of that anti-Masonic upheaval that in 1832 gave the electoral vote of Vermont to William Wirt, is a fact that in all probability tended to make the testator an anti-Mason.

Appellants claim the bequest to the National Christian Association is void on the ground of public policy. We hardly think this claim will be seriously considered by this court. The National Christian Association is a legal body, incorporated in the state of Illinois, and is the representative of seventeen religious organizations. There are twenty-one 'church organizations that are fundamentally opposed to secret societies, to wit: United Presbyterians, United Brethren, Seventh-Day Adventists, Christian-Reformed Church, Primitive Baptists, Seventh-Day Baptists, Scandinavian Baptists, Dunkards, Friends, Norwegian Lutherans, Danish Lutherans, Swedish Lutherans, German Lutherans, Mennonites, Moravians, Plymouth Brethren, Associate Presbyterian, Reformed Presbyterian, Free Methodists, Wesleyan Methodists and Roman Catholic.

Insane delusion should be distinguished from prejudice

or some rational belief not well founded, however perversely the testator may have clung to it. Schouler, Wills [2d ed.], sec. 162.

Delusions and hallucinations constitute that species of mental unsoundness which is marked by persistent and incorrigible beliefs that things which exist only in the imagination of the patient are real. 16 Am. & Eng. Ency. of Law [2d ed.], 2563.

*Reavis & Reavis,* in reply:

In the case of monomania and insane delusion, a person, by artful, false and repeated surmises and insinuations operating upon a sensitive and excitable mind of another, may foster and exasperate, if not create, an insane delusion. *Woodbury v. Obear,* 7 Gray [Mass.], 467, 472.

Bissell made this will at the house of Holman in company with Phillips. There is no kind of question on that subject. These two men wanted the will made precisely as it was made and the deed executed precisely as it was executed.

DUFFIE, C.

The first of the above entitled causes is a contest of the will of William C. Bissell, deceased, and the second is an equitable action brought to set aside a deed made by said Bissell to one Phillips, and executed by him at the same time he made the will in controversy. The questions in each case relate to the mental capacity of the grantor and testator at the time of the execution of said instruments, and the legal right of Bissell to devote his property to the object which it is claimed was intended. Both the deed and will were executed by Bissell on January 28, 1898, and he died on the 11th day of April following. He was eighty-seven years of age at the time of his death; a man of fine education, being a graduate of Yale College. He had been a teacher for some years, and at the time of his death had accumulated property estimated to be worth $18,000. The greater part in value of this property con-

sisted of a half section of land in Richardson county, and this half section he deeded to one Phillips on January 23, 1898, this being the conveyance in controversy in the first action. The will executed on the same day provided, first, for the payment of all the testator's debts and funeral expenses and the costs of a suitable monument; second, he gave to his wife, Mary C. Bissell, the use, profits, rents and incomes of all the remainder of his property, during her natural life, in lieu of any right, interest or claim which she might otherwise have in his property by the laws of Nebraska. The will further provided that after the death of his wife, Mrs. Ida M. Carsh, a niece, should receive the sum of $500, and Isaiah G. Fowler, a nephew, the sum of $500. He further directed that such person or persons as should be intrusted by letters testamentary or of administration with the execution of his will should, upon the death of his wife, sell at public auction, for cash, all real or personal property left by him and then remaining undisposed of, and transfer the same to the purchaser or purchasers after paying the legacies above mentioned, and the remainder of the proceeds was to be paid over to the National Christian Association, incorporated under the laws of the state of Illinois, having its principal place of business in Chicago. John Holman, of Humboldt, Nebraska, and William I. Phillips, of Wheaton, Illinois, were made executors of this will. The charter or articles of incorporation of the National Christian Association were not introduced in evidence, and the only knowledge which we have of its purpose and power is derived from the evidence of William I. Phillips, its general secretary. He states that it is a corporation organized under the laws of the state of Illinois; that it was not organized for pecuniary profit, there being no stock and no profits; that the general purposes of the corporation are the removal of things that hinder the kingdom of Christ on the earth. It is an evangelical missionary society, which, among other things, seeks the removal of secret societies, or, rather, the keeping of Christians from uniting with secret societies, and

getting them to come out from among them and be separated from them for various reasons. After this statement he was asked, "That is the general purpose of the association,—to oppose secret societies?" and he answered, "That is among its purposes. It is not its only purpose. It is the only association that makes a specialty of opposition to secret societies. That is its general character."

Q. In a general way, you are opposed to all organizations; but isn't it a fact that it is the avowed purpose of your corporation to fight secret societies?

A. That is one of its avowed purposes.

Q. Was there any other avowed specific purpose mentioned in your articles of incorporation?

A. It mentions whatever hinders the kingdom of Christ.

Q. Well, that is a little indefinite. Their specific object is to fight secret societies?

A. They are to oppose secret societies, the Masons in particular.

Q. That is stated in your articles of incorporation?

A. Yes, sir.

Q. What other evils in society are you to fight, named in that article of incorporation?

A. I don't recollect that there is any specific evil named besides that.

Again, in his testimony, Mr. Phillips, in reply to a question as to how the missionaries of the society discharged their duties said: "They preach as other ministers preach, more or less, and they hold revivals." On being asked whether the corporation was under the supervision of any particular church, he answered: "No, sir; it is interdenominational; understand, it is not a denominational institution. There are seventeen different religions represented in its organization. They often preach as other ministers do,—occupy the pulpit and preach what are called sermons. They sometimes hold revivals, as ordinarily meant by that term, without any special reference to the specific lodge question, and they often lecture on temperance. Of course, wherever the way opens, they try to

present the principles of the association to the people before whom they are able to speak. But we don't endeavor to preach evil against those who are members of secret societies. It is simply to present the principles as they believe and show the principles of Christianity, as we understand it,—that Jesus Christ and his doctrines are not in harmony with the teachings of secret societies."

Q. You are out to convince people of that?

A. Yes, sir, that is the object.

We believe that the foregoing fairly represents, so far as the record discloses, the object and purpose of the National Christian Association, but, as before stated, this is not gathered from the articles of the association themselves, but from the testimony of Mr. Phillips, as it was drawn out by the contestants of the will. The association also publishes a paper or periodical called the Cynosure, and Mr. Bissell had been a subscriber to this publication for many years, and for twenty-five years or more had bitterly opposed all secret societies, and especially the Masonic society; and one of the contestants testified that it was his opinion, manifested by his words, that the Masonic order was the oldest, most powerful and wickedest of the secret fraternities; that it was antagonistic to our civil government, and that the higher degrees of Masonry would uphold any of its members in any crime, not excepting murder and treason. Another witness testified that he gave as his reason for opposing secret societies that they would commit crimes, and that no Christian man could be a member of a lodge. He could not be a Christian if he was a member of any of these secret orders. In 1892, Bissell wrote a will, which he denominated "My first last will and testament," providing: First—For the payment of all debts and funeral expenses, and a monument not to cost exceeding $100. Second—His wife to have the income from his estate during her natural life, but subject to an annual payment of $25 to be made to his sister, Melicent Herrick. Third—After the death of his wife, the said Melicent Herrick was to be paid $100 per annum for the

term of five years if she should live so long, the $25 per annum to be paid during the life of his wife to be deducted therefrom; to his niece, Mrs. Carsh, $500; to his nephew, Isaiah G. Fowler, in trust for his second son, the sum of $500; said National Christian Association the sum of $1,-000, to be used in promoting the general objects of said corporation in Richardson county, Nebraska; to the trustees of Wheaton College the sum of $500, to be used and applied at the rate of $50 per annum in payment of all teaching expenses in said college of some young man or young woman whose piety and natural abilities promise future usefulness, and whose avowed purpose is to devote himself or herself to the service of God and humanity, and who is known as a witness for Jesus Christ against secret societies and Freemasonry in particular. The will provides that, after the death of his wife, his property should be sold at private sale on such terms as might be deemed best, or at public auction for cash on reasonable notice, and the proceeds of such sales, after paying the above-mentioned legacies, was to be paid over to the National Christian Association, to be used by said association in promoting in the state of Nebraska the objects for which said association was incorporated.

The first will, together with other evidence in the case, manifested a disposition of long standing on the part of Mr. Bissell to devote his property, or the greater part thereof, to the work of the National Christian Association. Some time prior to the making of the will a rumor came to the ears of Mr. and Mrs. Bissell that some party held, or claimed to hold, a large claim, which would be presented as a demand against his estate after his death; and we learn from the testimony of Mrs. Bissell that in talking over the rumor with her husband, he was greatly disturbed with the thought that a contest might arise over his will, and she advised him to send for Mr. Phillips, and to make a disposition of his property during his lifetime. Mr. Phillips was accordingly sent for, and arrived in Humboldt, as we infer from the testimony, January 27. He

apparently brought a blank form of will, and the will in question, as well as the conveyance of the half section of land, was written by Phillips. A considerable part of the appellant's briefs is devoted to the question of undue influence exerted by Phillips in this regard, and to a conspiracy claimed to exist on the part of Phillips and some other parties to procure the execution of these instruments. The evidence discloses that the instrument was written by Phillips at the house of Mr. Holman, and it is said that Bissell was dragged from his home, and from the side of his sick wife, the more surely to be coerced, in the absence of friends and relatives, into this disposition of his property. The circumstances of these instruments being written at the Holman residence is, we think, fully and fairly explained. The house occupied by Mr. Bissell at the time was small, consisting, as we understand it, of but three rooms. Mrs. Bissell was sick and had two attendants. After the arrival of Mr. Phillips, Holman called to ascertain the condition of Mrs. Bissell, and while there, being informed that Mr. Phillips had come from Wheaton to transact some business for Bissell, and observing that there was no place at the Bissell house where they could transact their business privately, he invited them to his own house, and to the use of his office, he having an office room in his residence. The invitation was accepted and the papers, as we understand it, were there prepared for execution. A careful examination of the record not only fails to disclose any unfair or coercive measures used on the part of Phillips or any one else to procure the execution of these instruments, but we think it fairly appears from all the evidence that they were made deliberately, and after mature consideration on the part of Bissell, to carry out a long cherished purpose, which the court can not interfere with, provided the object of his bounty is neither illegal, immoral or contrary to public policy.

It is insisted, however, that the decedent was a monomaniac in his opposition to secret societies, and that the making of this will and deed was the direct result of a

delusion entertained by him that such societies, and the Masonic order in particular, were immoral, criminal and subversive of Christian principles and of good government. We have found nothing in the evidence to justify such a belief. Aside from the usual failure of memory attending men of his age, there is nothing in the record to show that he was not in full possession of his faculties and perfectly competent to transact his business. It is true that he was opposed to all secret societies and bitterly opposed to the Masonic order. That this opposition had unbalanced his mind in that respect is nowhere shown. He undoubtedly believed that the world would be better without the existence of these societies. He believed that they were opposed to the teachings of Christ, and no doubt believed that too many men sought the lodge-room rather than church fellowship. But such belief, entertained as all know the case to be, by many good citizens and Christian men, is not evidence of an insane delusion. Thousands of our best citizens to-day believe the same thing, and the courts would be overwhelmed with contests over wills and conveyances did they accept such a belief alone as evidence of an insane delusion which would avoid a deed or a testamentary devise.

It is further argued that the devise was illegal, and the ground of the argument is this: By section 165, chapter 16, Compiled Statutes, subordinate lodges of Ancient Free and Accepted Masons, all lodges organized as subordinate lodges of the Independent Order of Odd Fellows, and Farmers' Alliance, Knights of Labor, the grand lodge Knights of Pythias, and other secret societies named, are made bodies corporate. It is said that these societies are recognized by the laws of this state as legal, moral and worthy societies, and that any disposition of property made for the purpose of using the proceeds to oppose these organizations is illegal and void. With this contention we can not agree. This is a country of free speech and free opinions. One who does not believe in secret societies, who thinks that their tendency is bad, has

a right in every legitimate way to oppose their growth, and to seek by all legal means to cause their members to withdraw their membership. He may go out upon the street and preach against their existence, and he may hire others to do the same. No lawyer of standing would, we think, risk his reputation by urging that Mr. Bissell could avoid payment of any sum he might agree to pay Mr. Phillips, or any other speaker, for delivering a lecture in opposition to secret societies. He would not urge to the court that Mr. Bissell would not be liable for the rent of a hall engaged by him for such a purpose. He would not urge that Mr. Bissell might escape payment of his subscription to the Cynosure upon the ground that it was advocating illegal principles; and, if not, why might not he devote his property at his death for the employment of men to advocate the same principles for which he would be legally liable, had he contracted with them to advocate during his lifetime. Why may he not bequeath his property to the use of any purpose for which he could legally pledge it in his lifetime?

Many churches oppose secret societies. Their ministers preach their opposition from the pulpit, and yet no one has advocated that they be suppressed for denouncing legal and legitimate organizations, and no one has yet sought to avoid a subscription to a church upon the ground that it is advocating principles at war with the legally established institutions of the state.

It might be further stated that Bissell had no children, and no nearer blood relative than the nephew and nieces who are the contestants in this case. While they were on friendly terms, no great degree of intimacy appears to have existed between them. Mrs. Bissell testified that none of them had visited him during the twenty-five or twenty-six years of his residence in Humboldt, and that, while there were occasional letters passed, no intimate relations existed between them. We speak of this to show that aside from his wife, there was no near relatives to whom his property could be left, and to observe that it is not a case

where a father disinherits his children or those whom he would naturally be expected to provide for.

Objections were taken to some of the instructions given by the court, and the refusal of the court to give others requested by the contestants. We have before remarked that, in our opinion, there was no evidence tending in any reasonable degree to show that the testator was not perfectly competent to make a will or to otherwise dispose of his property. Indeed, we think that the court would have been fully warranted in taking the case from the jury and directing a verdict. In this view of the case, it would be a useless waste of time to review the instructions given or refused. The verdict was the only one which could have been sustained under the evidence, and whether the instructions in all cases announced a correct rule of law for the guidance of the jury becomes immaterial. If error inhered in the instructions given, or if the court improperly refused instructions announcing correct rules for the determination of the case by the jury, it was error without prejudice, and could not affect the result.

The court found that the deed made by Bissell to Phillips was in trust for certain purposes fully set out in the decree, but not necessary to be repeated in this opinion. Objection is made to this finding as entirely outside the issues made by the pleadings, and not responding to any question in controversy between the parties. At first impression we were inclined to believe that the court had committed serious error in extending its decree beyond the controversy made by the immediate parties to the action, and declaring a trust in the property conveyed in favor of Mrs. Bissell and others. On more mature consideration we have concluded that the appellants have no cause of complaint. By the decree of the court the appellants were found to have no right or interest in the property. That was an end of their case. What became of the property thereafter was no concern of theirs, and they have no standing to question the decree except in so far as it affects their own claim of title. The court with commendable care used its power to

In re Bissell.

carry into effect the evident and obvious desire of Mr. Bissell in the disposition of his estate. No one having any interest therein is complaining of the decree entered, and we recommend that the judgment be affirmed.

AMES and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.

NOTE.—*Insanity.—Testamentary Capacity.*—The relation existing between a person who is a firm believer in spiritualism, and the medium upon whose spiritual manifestations he habitually relies, is one of personal confidence, and all contracts between them, by which the medium obtains an advantage, are presumed to have been procured through the undue influence of the latter. And in an action to enforce such a contract, the burden is cast upon the medium of overcoming the presumption by showing that there was no undue influence. *Connor v. Stanley*, 72 Cal., 556.

A belief in spiritualism does not incapacitate from making a valid will even where the testatrix acted under supposed instructions from the spirit of her deceased brother, unless absolute unsoundness of mind is found. *Brown v. Ward*, 53 Md., 376, 36 Am. Rep., 422. To the same effect is *Robinson v. Adams*, 62 Me., 369, 16 Am. Rep., 473.

A belief in the doctrine of metempsychosis does not argue insanity or defeat a will by which the testator, having no family, left his estate to the society for the prevention of cruelty to animals. *Bonard's Will*, 16 Abb. Pr., n. s. [N. Y.], 128.

The testator, an Englishman who had served as an army officer in India, had become a convert to Islam, and also a believer in astrology and necromancy. He left money by his will to be paid over to the Turkish ambassador, to be used for the erection of a cenotaph at Constantinople, with the name of the testator engraved thereon and with a light burning therein, the remainder of the bequest to be divided among the poor of Constantinople. Held to be the act of a capable testator and therefore valid. *Austen v. Graham*, 1 Spinks [Eng. Eccl. and Ad.], 357.

Partial insanity does not incapacitate from making a will. A will made in a lucid interval by a person habitually insane is valid; and when there is nothing unreasonable on the face of the will of one habitually insane, it will be presumed to have been made in a lucid interval. *Kingsbury v. Whitaker*, 32 La. Ann., 1055, 36 Am. Rep., 278.

*Expert Witness.*—It was held in California that a Roman Catholic priest who had been regularly educated and had officiated as a priest for ten years and a part of whose education was to become competent to pass on the mental condition of communicants in his church,

with a view to administering the sacraments, and whose education involved the study of physiology and psychology and who in his capacity as a priest had been called upon almost daily to pass upon the mental condition of candidates for the sacraments, could testify his opinion as to the sanity of the testator. *Estate of Toomes*, 54 Cal., 509.

*Non-Expert Witnesses.*—Upon the trial of Charles J. Guiteau for the murder of James A. Garfield, before the supreme court of the District of Columbia, 1881, Justice Cox presiding, John A. Logan was called by the defense as a witness on the sanity of the prisoner. He testified that he had seen Guiteau on probably three occasions; not more; that the first occasion was at his room where the prisoner came about 8 or 9 o'clock in the morning, without being invited. After describing in detail two interviews with the prisoner, witness testified that he "thought there was some derangement of his mental organization." He was afterwards allowed to testify to a statement made to his landlady with regard to his opinion of the prisoner's mental state, upon seeing him at the breakfast table. This was upon the theory that his conclusion expressed at the time was a part of the same transaction. Trial of Guiteau, Part I., pp. 444-447.

A witness not an expert can not give his opinion on a question of insanity. *Boardman v. Woodman*, 47 N. H., 120, 121; *State v. Pike*, 49 N. H., 399, 407, 6 Am. Rep., 533, 544. In each of these cases there is a vigorous dissent by Doe, J.

A non-expert witness may give his opinion as to the sanity or insanity of a person, only when he shows other qualifications, and narrates to the jury the facts on which he bases his opinion. *Schlencker v. State*, 9 Nebr., 241; *Hay v. Miller*, 48 Nebr., 156; *Hoover v. State*, 48 Nebr., 184; *Lamb v. Lynch*, 56 Nebr., 135; *Snider v. State*, 56 Nebr., 309.—REPORTER.