THE CORPORATION OF THE MEMBERS OF THE
CHURCH OF JESUS CHRIST OF LATTER DAY
SAINTS RESIDING IN THE FIFTEENTH EC-
CLESIASTICAL WARD OF SALT LAKE STAKE
OF ZION, a Corporation, Respondent, v. HELEN
WATSON, Appellant.

### No. 1347.   (69 Pac. 531.)

1. **Evidence: Hearsay: Self-Serving Declarations.**

As against plaintiff in ejectment, claiming under deed from C.
against his wife's daughter, claiming as her heir, statements of
the wife, who was not a party to the suit or deed, made after
execution of the deed, and not in plaintiff's presence, narrating
the circumstances of the execution, to show undue influence, are
not admissible, being self-serving declarations and hearsay.

2. **Evidence: Res Gestae: Declarations against Interest.**

Where plaintiff in ejectment claims under deed from C., and de-
fendant claims as heir of C.'s wife, and that the deed was void
for undue influence, testimony of J., attorney for P., represen-
tative of plaintiff, as to conversation between C., his wife, P.,
and J. with reference to the conveyance, is admissible against
defendant as part of the *res gestae*, and as a declaration of the
parties against interest.

4. **Ejectment: Void Deed: Failure of Grantee to Comply
with Agreement to Secure Life Estate to Grantor's
Wife.**

Two days before death of C., who, having no children or heirs, had
married a widow with children, P., a friend and bishop of his
church, called on him, and asked what disposition he desired to
make of his property.  He replied that he wanted to give it to
the church; and his wife, who was present, being asked by P.
what she had to say, replied that it was satisfactory, provided
she had the use of the property for life; and this was assented
to.  The next day, having in the meantime been subject to visi-
tations and advice of his wife and her children, who lived with
him, he, having heard read the absolute deed of the property to
the church, prepared by P.'s attorney, signed it in the presence

of his wife, who assented to it with the understanding that she was to have the right to the property for life. *Held,* that right to the property for life never having been secured to her as contemplated by the agreement, which was based on the consideration of the deed, but she, after being permitted to reside thereon for several years, having been required to take a lease of the property for $1 a year, the deed was void.

3. **Confidential Relations: Spiritual Adviser: Undue Influence.**

Dealings by a spiritual adviser with one who is without independent advice, and is about to die, and whose mind is impaired by a physical weakness, by which the adviser receives any advantage in the transaction between them, will be set aside as being contrary to the principles of equity, whether the benefit accrues to the spiritual adviser or to some other person who may have become the beneficiary through such influence.

(Decided July 3, 1902.)

Appeal from the Third District Court, Salt Lake County.— *Hon. W. C. Hall,* Judge.

Action in ejectment. From a judgment in favor of the plaintiff, the defendant appealed.

REVERSED.

*D. S. Truman, Esq.,* for appellant.

It was not enough to warrant a decision in favor of plaintiff to have found that it does not appear that said Bishop had acquired influence over Chatfield or that he took advantage of such or any influence. It must, on the contrary, to uphold this judgment, be made to appear that such was not the fact. Instead of it being made to appear that way by us, it devolved upon the plaintiff to, under the conditions of this case, show that he did not have the influence nor use it, not on us that he did, because the legal presumption is with us and it rests with them to overcome it. The authorities are

overwhelmingly against the plaintiff.   Ross v. Conway, 28 Pac. 785; Ford v. Hennessy, 70 Mo. 580; Richmond's Appeal, 59 Conn. 226; Pironi v. Carrigan, 47 N. J. Eq. 135; Norton v. Relly, 2 Eden 286; Hugenin v. Basely, 14 Ves. 273; Thompson v. Hefferman, 4 Dru. & War. 291; Dent v. Bennett, 4 Mylne & C. 269; Story, Eq. Jur., 311; Caspari v. First German Church, 12 Mo. App. 12; Whyte v. Meade, 2 Ir. Eq. Rep. 420; McCarthy v. McCarthy, 9 id. 620; Connor v. Stanley, 72 Cal. 556.

*F. S. Richards, Esq.,* and *J. T. Richards, Esq.,* for respondent.

MINER, C. J.—This action of ejectment was brought by the respondent to recover the possession of the premises in question.   The record shows that in April, 1886, George Chatfield, of the age of sixty-seven years, without children or heirs, married Martha Sandal, a widow lady of about sixty years, who had three children living.   After such marriage, the parties continued to reside together in a small dwelling house owned by Chatfield, the premises in question, until August 4, 1886, when Chatfield died intestate.   Helen Watson, the defendant here, was the daughter of Martha Sandal by her former husband, and resided with her mother on the premises in question until the latter's death in 1899, and has since resided there.   Chatfield had always been a man in good health, clear mind, and of decided opinions.   For about two weeks prior to his death he had been sick in body, and, for a day or two prior to his death, confined in bed.   The testimony shows that he was sane and mentally capable of transacting business up to the time of his death.   Chatfield was a member and believer in the doctrines of the Church of Jesus Christ of Latter-Day Saints, and Joseph Pollard was the resident bishop of the same church and ward in which Chatfield lived, and they had been old acquaintances, friends,

and frequent visitors. . Bishop Pollard died several years prior to the time of the trial. Martha Sandal Chatfield, the widow, died in 1899. During Chatfield's sickness, about a day or two prior to his death, Bishop Pollard and N. V. Jones, his counselor, called upon Chatfield, and while there, and after talking of Chatfield's death and other minor matters, Bishop Pollard asked Chatfield what disposition he desired to make of his property. Chatfield replied that he wanted to give it to the Fifteenth ward, meaning the respondent. At this time his wife, Martha Chatfield, was present, and heard all the conversation. Bishop Pollard then turned to Mrs. Chatfield, and asked her what she had to say. Mrs. Chatfield replied that it was satisfactory to her, provided that she had the use of the property during her lifetime. This was assented to. Thereafter Mr. Jones drew a deed conveying the premises to the respondent corporation, and the next day Bishop Pollard, N. V. Jones, and Geo. M. Cannon returned to Mr. Chatfield's house, and Mr. Cannon read the deed in question to the latter carefully, and fully explained its contents to him. Mr. Chatfield was satisfied with it, was desirous of signing it after it was read over to him, which he did by making his mark and acknowledging it. Mrs. Chatfield was present at their own home when the deed was executed, and assented to it, but with the understanding that she was to have a life lease and the use and right to live upon the property as long as she lived. Geo. M. Cannon, N. V. Jones, E. W. Parry, who were present at the time of the execution of the deed, testified, in substance, that Chatfield was of sound mind and memory at the time of the conversation and execution of the deed to the respondent. No inducements or improper influences appeared to have been used in any outward manner to procure the execution of the paper in question, so far as the record presents the fact, except as hereinafter stated. The testimony of the appellant and her sister, Mrs. Giles, does not show the incompetency of Mr. Chatfield to

make a contract at the time the deed was made, but tends to show that in his weak condition of body he could be more easily influenced and controlled by those in whom he had confidence than when in good health. At the time, and before the execution of the deed, Mr. Chatfield was in his own home, surrounded by his wife and her daughters, and was free to consult with them or others who visited them concerning his property and business affairs. So far as appears, no private interview was had between the bishop and Mr. Chatfield in the absence of his wife, nor is there any evidence to show affirmatively that Bishop Pollard exercised any improper influence over him because of the existence of any confidential relationship between them as bishop and member of the church society in question. After Chatfield's death, Mrs. Chatfield remained in possession of the house and lot as sole occupant until 1894, without paying rent. About the year 1894, for the assumed purpose of adjusting the title, so that adverse claim should not arise in favor of the heirs, the plaintiff executed to Mrs. Chatfield a lease of the premises during her life at a yearly rental of one dollar, which lease was signed by Mrs. Chatfield, and rent was thereafter demanded by the corporation and paid by her for three or four years prior to her death in 1899, when she ceased to pay rent. After Mrs. Chatfield's death, this suit was commenced, by the plaintiff and respondent, against the appellant, the daughter of Mrs. Chatfield, to recover possession of the premises in question. The defendant resisted the plaintiff in obtaining the possession of such property on the ground that the plaintiff obtained the same by undue influence asserted upon the grantor of the premises, George Chatfield, while he was in such a condition, mentally and physically, as to render him in an unfit condition to transfer the property, and such undue influence was exercised by his spiritual adviser, Bishop Pollard, who was the bishop of the stake of Zion, in which said Chatfield was living; and that the said Mrs. Chatfield never

25 Utah—4

had any independent advice, but, relying upon the statement made to her by Bishop Pollard, the bishop of said ward, she was induced to take a lease giving her a life tenancy in the premises; otherwise, she would not be permitted to reside there any longer. That George Chatfield and his wife were old and infirm; firm believers in the tenets of the faith of the Church of Latter-Day Saints, and that, by reason of the condition that Mr. Chatfield was then in, the deed was void, and should be annulled by the court. The court made findings of fact and conclusions of law and decree in favor of plaintiff.

The appellant, to maintain her defense, sought to show the conversation between Mrs. Lewis, a daughter of Mrs. Chatfield, and Mrs. Chatfield in her lifetime, at a time subsequent to the date of the execution of the deed by Chatfield to the respondent, when no one representing the respondent was present. This testimony was clearly hearsay and inadmissible as evidence. The declaration of Mrs. Chatfield concerning the deed and the property was inadmissible. In 1886, a wife was not, under the statute, a necessary party to a conveyance of land by the husband. A husband could at this time convey his property without joining his wife. The testimony sought was self-serving narrations of past transactions by one not a party to a deed or suit, when other parties in interest were absent.

The appellant also objects to the testimony of N. V. Jones wherein he relates the conversations between Mrs. and Mr. Chatfield, Bishop Pollard, and himself with reference to the conveyance of land to respondent. The admission of this testimony was proper because the appellant was claiming title as heir of Mrs. Chatfield, and as an admission of the predecessor in interest of the appellant against her own interest, when all the parties interested were present, and at a time when the deed was executed. The conversation was admissible in evidence as a declaration of the parties

against their own interest, and as a part of the *res gestae,* and because it does not appear that any exception was taken to the admission of the testimony, or to the refusal of the court to strike it out.

Among others, the court made the following finding, which the appellant contends was not supported by the evidence, and that it is not sufficient to support the decree: "(13) That the said George Chatfield was of a kind and loving disposition to his family, and died leaving practically no property for the care, support, and future welfare of his said wife and family, except that it appears that the said Martha S. Chatfield was to have a life interest in the property described in the plaintiff's amended complaint; but it does not appear from the evidence that this was caused by reason of Joseph Pollard, or any other person, taking the said George Chatfield away from his home or family, and causing him to execute said or any deed, either while in a dying condition or otherwise." It is said in Ross v. Conway, 92 Cal. 632, 28 Pac. 785: "The rule is inflexible that no one who holds a confidential relation towards another shall take advantage of that relation in favor of himself, or deal with the other upon terms of his own making. That, in every such transaction between persons standing in that relation, the law will presume that he who held an influence over the other exercised it unduly to his own advantage, or, in the words of Lord Langdale in Casborne v. Barsham, 2 Beav. 78. 'The inequality between the transacting parties is so great that, without proof of the exercise of power beyond that which may be inferred from the nature of the transaction itself, this court will impute an exercise of undue influence.' That the transaction will not be upheld unless it shall be shown that such other had independent advice, and that his act was not only the result of his own volition, but that he both understood the act he was doing and comprehended its result and effect. The rule finds its application with peculiar force in a case

where the effect of the transaction is to divert an estate from those who, by the ties of nature, would be its natural recipients, to the person by whose influence the diversion is made; whether such diversion be for his own personal advantage, or for the advantage of some interest of which he is the representative." This is the prevailing doctrine, and is applicable to cases wherein the effect of a transaction is to bestow or transfer an estate from the possession of the heir or its natural recipients to those for whose personal advantage the unnatural disposition is made. Any dealings by a spiritual adviser with one who is without independent advice, and is about to die, and whose mind is impaired by a physical weakness, by which the adviser receives any advantage in the transaction between them, will be set aside as being contrary to the principles of equity, whether the benefit accrues to the spiritual adviser or to some other person who may have become the beneficiary through such influence. Norton v. Relly, 2 Eden 286; Hugenin v. Baseley, 14 Ves. 273; Thompson v. Heffernan, 4 Dru. & War. 291; Dent v. Bennett, 4 Mylne & C. 269; In re Welsh, 1 Redf. Sur. 246; Richmond's Appeal, 59 Conn. 226, 22 Atl. 82, 21 Am. St. Rep. 85; Ford v. Hennessy, 70 Mo. 580; Pironi v. Corrigan, 47 N. J. Eq. 135, 20 Atl. 218; Connor v. Stanley, 72 Cal. 556, 14 Pac. 306, 1 Am. St. Rep. 84; 1 Bigelow, Fraud, 352; Story, Eq. Jur., sec. 311; Darlington's Appeal, 86 Pa. 512, 27 Am. Rep. 726; Moore v. Clymer, 12 Mo. App. 12; Odell v. Moss, 130 Cal. 352, 62 Pac. 555; Anderson v. Taylor, 37 N. C. 420, 38 Am. Dec. 689; Ross v. Conway (Cal.), 28 Pac. 785; Boyd v. De La Montagnie, 73 N. Y. 498, 29 Am. Rep. 197.

It appears from the testimony and from the findings in this case at the time in question the grantor was a man of sound mind. His wife was called in consultation at and before the deed was executed, and she assented to the disposition he proposed to make, subject to her right to

a life estate in the property. No change of purpose on his part was manifest. He was not sought secretly and alone, and induced to make the deed, but at the time of the whole transaction was attended by his wife, who at that time and subsequently assented to, and concurred in, the disposition proposed to be made. The children of the wife were living in the same house, and had access to him and he to them. He was at all times between the time of his first declaration to the bishop that he proposed to give the property to the church society, and the day following, when the deed was executed, subject to the visitation and advice of his wife and her family. The suggestion as to whom he would give his property first came from the grantor. He afterwards, in the presence of his wife, heard the deed read, and assented to it; signed and acknowledged it. In the light of all these circumstances, no serious difficulty arises in reconciling the findings to the facts except with reference to the thirteenth finding and the failure on the part of the grantee to deliver the life estate to the widow relieved from all burdens. It will be remembered that the bishop and the grantor were friends. The relationship existing between them was confidential. The influence of a spiritual adviser over one who is about to die is held to be one of the most powerful that can be exercised over the human mind when impaired by physical weakness. The bishop doubtless intended to do as the grantor intended should be done; but he failed to carry out the agreement made. So strong was the confidence of the grantor that the agreed course would be pursued with reference to the property that he executed an absolute deed of his property to the Fifteenth ward corporation without reserving such life interest, or requiring in advance the execution or delivery of the deed to the wife of the agreed life interest in the property so conveyed. In this respect the thirteenth and other findings on that subject are not supported by the evidence, and the

decree has no support from the evidence. The undisputed evidence shows that the wife and husband assented to the conveyance of the property to the Fifteenth ward, with the distinct understanding that the wife should have and retain a life estate in the property. While the grantor conveyed the whole estate to the Fifteenth ward, no reservation of a life estate therein was had in the wife, nor was any such title conveyed to her. It is true that the widow was permitted to reside on the premises for several years without paying rent, but this was simply an act of sufferance, without any accompanying title to the property in the widow. The church corporation could only speak by its written declarations and official acts and deeds. When the deed was delivered the legal title passed to the Fifteenth ward corporation, and the wife had lost her interest, except as the ward might grant her a right for a time, subject to be annulled at will. But before the expiration of seven years the ward required that she execute and accept a lease upon the property during her life, and pay one dollar per year therefor. She accepted the lease as a condition of her right to remain in possession of the premises, and paid the stipulated rent for several years thereafter, and probably until she was advised of her legal rights in the premises. The stipulated life estate promised the widow at the time the deed was executed was never conveyed to her by deed, nor were her rights so attempted to be given her by her husband as a part of the understanding and consideration for the contract reserved in the deed or other writing for her benefit. Whatever right she thereafter obtained was awarded her not by her husband's bounty, but by a contract or lease imposed upon her, whereby she was required to pay a stipulated sum annually in order to retain the right to the property her husband gave her during her life. While the grantee in the deed permitted her to reside on the property for a time without paying rent, it held the absolute fee title, and the widow had no legal interest therein, except that she acquired by purchase under

the lease. This was not in conformity with the agreement made when the deed was executed, and was a violation of the understanding and compact made by the parties, based upon the consideration of the deed to the respondent, to which the assent of the wife and the husband was obtained with the expectation that the life interest would be conveyed or reserved to the wife without the exaction of another or further consideration for the continuance of the agreed life estate in the wife. While it may have been the intention of the grantee and its officers to carry out the terms of the contract, it is evident that through oversight, overconfidence, undue influence, mistake, or otherwise, the purposes of the grantor and his wife were not observed in this respect. The contract, being executed for the benefit of one party, should also have been executed for the benefit of the other party, in conformity with the agreement. If it was safe to rest in parol for one party, it was equally safe for the other. The findings and decree upon this subject are not, in our opinion, supported by the evidence, but are contrary to the facts and legal presumptions arising in such cases, as heretofore expressed.

The case should be remanded to the district court, with instructions to set aside the findings, vacate and reverse the judgment and decree, and to grant a new trial.

BASKIN and BARTCH, JJ., concur.