MARGUERITE GUILL AND FERN ANSON, GUARDIANS OF THE PERSON AND ESTATE OF TERESA MURPHY, APPELLEES, V. LEO A. WOLPERT, APPELLANT.

MARGUERITE GUILL AND FERN ANSON, GUARDIANS OF THE PERSON AND ESTATE OF TERESA MURPHY, APPELLEES AND CROSS-APPELLANTS, V. ST. JOSEPH'S CATHOLIC CHURCH, LYONS, NEBRASKA, APPELLANT AND CROSS-APPELLEE.

218 N. W. 2d 224

Filed May 16, 1974.   Nos. 39262, 39284.

Leo M. Williams and Deutsch & Hagen, for appellants.

Moodie & Moodie, Fay H. Pollock, and Jewell, Otte, Gatz, Magnuson & Collins, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, and CLINTON, JJ., and FLORY, District Judge.

CLINTON, J.

The controversy which gives rise to these causes may be described as a sequel to the one decided in Anson v. Murphy, 149 Neb. 716, 32 N. W. 2d 271. These are two actions by the guardians of Teresa Murphy to set aside three deeds, the execution and delivery of which were allegedly procured by the exercise of undue influence by Leo A. Wolpert, Pastor of St. Joseph's Catholic Church, Lyons, Nebraska. Teresa Murphy, who was born in about 1880 or 1882, is grantor in each of the deeds. Each deed reserves to Teresa a life estate and conveys to George A. Carruthers a life estate commencing with the death of the grantor. One of the deeds executed on March 20, 1962, conveys a remainder in-

terest to Leo A. Wolpert, the defendant in No. 39262. A second deed executed the same date and a third executed May 17, 1962, convey remainder interests to St. Joseph's Cathodic Church, Lyons, Nebraska, the defendant in No. 39284. Each deed conveys a separate tract of land. The grantee, George A. Carruthers, a nephew of Teresa, died in 1968 and is not a party to this action. The two guardians, Marguerite Guill and Fern Anson, are nieces of Teresa and, together with Timothy Crawford, are her next of kin. Hereafter we will refer to the persons involved, except Teresa, by their surnames, and the corporate defendant as the church. At the time of trial Teresa was incapable of testifying and neither side sought to elicit her testimony. The two actions are consolidated on appeal and pursuant to stipulation were tried on the same record in the trial court.

The court set aside and vacated the deed of March 20, 1962, which conveyed the remainder interest to Wolpert. It found valid the other deed of March 20, 1962, which conveyed the remainder interest to the church, and quieted in the church its remainder interest. It set aside and vacated the deed of May 17, 1962, wherein the church was conveyed a remainder interest. Wolpert and the church have appealed from the decree setting aside the two deeds. The plaintiffs have cross-appealed from the order finding the deed of March 20, 1962, to the church valid. The contending parties seem to agree that the seemingly conflicting determinations of the trial court are irreconcilable.

We, on trial de novo, find for the defendants on their appeals and against the plaintiffs on their cross-appeal. The evidence, except for opinions expressed by witnesses, is for the most part undisputed. The plaintiffs and the defendants contend on the inferences to be drawn and to a considerable extent on the rules of law to be applied.

The result which we have reached is based upon the

entire record. We set forth such of the evidence as is deemed sufficient to present the positions of the parties. However, we do not specifically note each bit of evidence on which the plaintiffs found on argument.

Teresa is the survivor of the nine children of William and Catherine Murphy. Five of the children, including Teresa, never married. The unmarried children, after the death of their parents, had lived together on the land described in the deed to Wolpert. One of the married sisters was the mother of Carruthers. His mother died and he was raised from infancy to manhood by the unmarried children, including Teresa. In 1946 the controversies resolved by Anson v. Murphy, *supra,* arose. Thereafter Teresa was estranged from the plaintiffs Guill and Anson and from Crawford, all of whom were children of married sisters of Teresa. Although the plaintiffs and Crawford lived near Teresa and previously were friendly, there was, after the 1946 litigation, no visiting and, according to the plaintiffs, Teresa usually refused even to say hello to them when they passed on the street. Teresa was not estranged from Carruthers who visited Teresa regularly until shortly before his death on November 28, 1968.

The evidence is undisputed that Teresa was intelligent, managed her own affairs until 1969, was strong-minded, and in the words of the plaintiff Anson, even "bullheaded." Her first pronounced mental and physical deterioration commenced with the death of Carruthers at which time she was a resident at a rest home in Onawa, Iowa. The plaintiffs at that time personally conveyed to Teresa word of Carruthers' illness and his subsequent death, and accompanied Teresa to prayer services for Carruthers. These events were apparently the first break in the estrangement. Later the plaintiffs handled Teresa's affairs pursuant to a power of attorney and when her mental condition worsened were appointed guardians on September 23, 1969. Under

authorization of the county court, they brought the present actions.

A tape recording of a conversation between Teresa and Wolpert in 1962 indicates that Teresa and the unmarried brothers and sisters, her coowners, had discussed rather vague plans for the ultimate disposition of the property here involved to the support of Carruthers and to the Catholic Church and for the purposes of masses to be said for the members of the family after all had died.

Wolpert, born in 1916 and a native of Bloomfield, Nebraska, became Pastor of the church in 1954. He became acquainted with Teresa about a year and a half later. She was a member of his parish. Except for a period of illness in 1962, to which we will make reference later, and until 1968, Teresa resided alone on the farm during the warmer months and spent the winters with friends in Omaha and with neighbors on a nearby farm.

The evidence shows that Wolpert visited Teresa in her home about once a month in the warm months, sometimes alone and sometimes in the company of his housekeeper. There were also group picnics at the farm, usually involving nuns who were in Lyons teaching. Wolpert on two occasions took Teresa to Omaha to begin her winter sojourn with her friends, the Heinzmans or the Staleys. Wolpert acknowledges that Teresa had trust and confidence in him. The record supports the conclusion that she had affection for him and that he treated her with consideration. She, over the years of their acquaintance, requested the saying of masses and paid stipends totaling about $300. The evidence is sufficient to support a finding of a confidential relationship and an opportunity to exercise influence.

In February 1962 when Teresa was paying a social call at the farm home of neighbors she became ill. Doctor Wolpert, a brother of defendant Wolpert and

who had been Teresa's doctor since 1957, was called. She was hospitalized in Onawa. The diagnosis was "cerebral vascular spasm with temporary aphasia." She remained in the hospital from February 4th to the 7th and at the end of that period had recovered complete use of her extremities and her speech. She was then at her request discharged to the Elmwood Rest Home. Wolpert visited her immediately following her hospitalization and thereafter periodically in the rest home. On March 30, 1962, she asked to go home "because she felt the worst of the winter was over, and she could get along for herself."

In July 1959, the year in which her last surviving sister died, Teresa had made a will under the terms of which she bequeathed to her nephew, Carruthers, a life estate in all her real estate, which will provided that upon his death: "I give, devise and bequeath any and all real estate owned by me at the time of my death to my good friend and Pastor, Leo A. Wolpert, to have and to hold unto him, his heirs and assigns forever." This will bequeathed her household goods, personal effects, heirlooms, and family items to Carruthers. By this will all the rest of her estate was left to Wolpert who was named executor. The will was prepared by Mr. Dea, an attorney at West Point. It was executed in his office and witnessed by Teresa's friends from Omaha, William and Edith Heinzman, and by one Mary Jean Strehle. Dea testified that it was prepared in accordance with instructions previously given to him by Teresa and that she read it herself before executing it. He testified the Heinzmans were not present during the conference on the will. Neither was Wolpert. Wolpert, however, had accompanied Teresa and the Heinzmans to Dea's office on the day of its execution. Dea testified that Wolpert was probably in the waiting room during that time. It appears from the later taped conversation previously mentioned that at some time Teresa

informed Wolpert of the will, but the time is not disclosed. That conversation also discloses that at some time Teresa had mentioned to him in at least general terms the family plans.

In March of 1962 while Teresa was still at the Elmwood Rest Home, Dea received the following letter from her:

"Onawa, Iowa
"March 2, 1962

"Dear Mr. Dea:

"I have been worried about my Will being sure of taking care of George Carruthers and then giving my property to the Catholic Church and Father Wolpert as stated in my Will. Will you please come to the Onawa Rest Elmwood Rest Home and bring the necessary Deeds to allow me to do the same with them as I have with my Will.

"Sincerely,
"Teresa Murphy"

It appears from the evidence that Wolpert had some advance knowledge that Teresa was planning some different disposition of her property because he had sent to Dea a note asking that he check the accuracy of descriptions of the Murphy real estate. This note indicated Wolpert knew a request to Dea from Teresa should be "in Monday's mail." Both Dea and Wolpert testified that Wolpert had discussed Teresa's affairs with Dea on two or three occasions. The testimony does not disclose the exact area of discussion. Apparently either for tactical reasons or because of their varying theories of what the law required of them, or for both such reasons, neither side attempted to develop this subject. The same reasons apparently account for failure to elicit details of conversations between Wolpert and Teresa.

Dea testified that Teresa came to the office prior to the preparation of the deeds of March 20, 1962, and

that they were prepared in accordance with directions she then gave which differed from the disposition made in the 1959 will. Dea does not recall who brought her to the office on that occasion, but it was usually the Heinzmans. A Mrs. Beard, with whom Teresa stayed for about a month in 1962 after she left the rest home, stated the Heinzmans provided transportation to take Teresa to a lawyer in West Point during that time. Later Dea took the deeds which he had prepared to Teresa at the rest home in Onawa. There the deeds were explained to Teresa. Teresa executed the deeds before two witnesses who were employees of the rest home and acknowledged them before a notary public who came to the rest home at Dea's request. Wolpert was not present at the execution of these deeds nor was any representative of the church. Dea testified that Teresa instructed him to record the deeds which he did. Later, pursuant to her instructions, he delivered them to Wolpert.

With reference to the deed of May 17, 1962, he testified that he had a conference with Teresa in his office before that deed was prepared. The record does not clearly show why this deed was not prepared with the others. It does not appear to have been through oversight. He drafted the deed in accordance with the instructions that Teresa gave him. Later he met Teresa at the bank in Lyons where the deed was executed. That meeting had been arranged between Dea and Teresa by telephone. The deed was witnessed by Dea and acknowledged before Lawrence Youngman, a notary public and an employee of the bank. On this occasion Teresa came to the meeting at the bank by herself. Dea testified the deed was explained to Teresa before it was signed. Again he was told by her to record the deed which he did. He believes that he delivered the recorded deed to Wolpert.

As to the reason given by Teresa for making the

gifts, Dea testified: "She told me that she had had in the past, problems of a lawsuit with her next of kin involving this property, and that she definitely didn't want it to go to them, except for her nephew George Carruthers. There apparently had been family problems in the Murphy family, and she was very definite in telling me that she did not want the property to go to these relatives."

On April 4, 1962, Dea notified Teresa by letter that the deeds of March 20, 1962, had been recorded. She responded on April 29, 1962, by letter advising him to keep the deeds and she would have Wolpert pick them up. On May 28, 1962, Dea mailed to Teresa a copy of the third deed which had been recorded and billed her for services and expense. She remitted payment with a letter of thanks.

On July 9, 1962, the plaintiff Guill and her brother, Tim Crawford, having learned of the recording of the deeds, wrote to the Archbishop of the Omaha Diocese a letter which is in part as follows: ". . . while at this rest home something must have happened which caused her to make out deeds to most of the land which rightfully belonged to 4 legal heirs, 2 nieces and 2 nephews, Fern Anson, Marguerite Crawford, George Carruthers and Tim Crawford, who were not consulted when this took place. . . . It was always intended that this property should be passed down to the legal heirs after the lifetime use by the Uncles and Aunts who were all single, of which there is one living, Teresa Murphy. . . . We the heirs knowing her condition the past several years let her go her own way until she started to dispose of the above mentioned property, now we feel that some action must be taken." The Bishop responded, indicating that he had not previously heard of the matter, and suggested that they take the matter up directly with their aunt. This was by letter dated July 24, 1962. Apparently on the same day the

Bishop received the communication from Guill and Crawford, one of his assistants wrote a letter to Wolpert asking to be filled in on the matter and followed on July 24, 1962, with copies of the deeds.

As a consequence of these communications from the Bishop, Wolpert, on receipt of the letter of July 24, 1962, went to Teresa's home, informed her of the communications, and made the tape recording of the conversation.

The records in the office of the county judge of Burt County indicate that on August 28, 1962, Teresa withdrew from the custody of the judge a will deposited on July 13, 1959.

On August 31, 1962, Dea, following a conversation with Wolpert of which he made Teresa aware, made arrangements to see Teresa.

On September 5, 1962, in Dea's office, Teresa executed another will in which she gave all her property except her real estate to Carruthers. This will appointed Dea executor. It also recited: "I have previously conveyed my real estate, which conveyances I do ratify and confirm." This will was witnessed by the Heinzmans and Wilma Gentrup. The preparation of this will and its execution probably occurred during the office visit by Teresa. Wolpert was not present, nor was any representative of the church.

On August 21, 1967, Teresa sent to Wolpert a letter postmarked Decatur, Nebraska, the body of which is typed (all other communications from Teresa were in her own handwriting). However, the envelope was addressed in her own handwriting, and the letter was as follows: "Some of my relatives are objecting to me because I deeded my land to you and the Church. They seem to think they have a right to it, and will fight you in court after my death.

"I am writing you this letter to let you know I have not changed my mind, and I want you and St. Joseph's Church to have the land after George and I are gone.

"I do not want my relatives to have this land because

I had to fight them in court to keep it, and had to buy some of it. The land deeded to the Church is for the parish needs, and that deeded to you is to make sure my family, George and I will receive Masses and prayers." At the same time and presumably in the same envelope was a handwritten letter as follows: "Just a line to ask that everything be done just as I asked to have in my will and here are the names of those I want the Masses for the dead." Then followed a list of the deceased relatives and a request by Teresa that her own name and that of Carruthers be added after their deaths.

The theory of the plaintiffs is that although Teresa was strong-willed, she was easily influenced by kindness and by agreeing with her. The plaintiff Guill testified: "Well, she was very headstrong, strong-willed, she had to have her own way. In other words, if she couldn't pitch, she wouldn't play. . . . Well, she was easily influenced. All you had to do was agree with her that she was right and everybody else was wrong and pat her and she was easily influenced." This witness was unable either on direct or cross-examination to give any example of an instance where any person was able by such methods to accomplish his or her purposes with Teresa. The witness advanced a theory that monthly gifts of $25 to Carruthers were accomplished by such means. The witness also attributed to such influences the fact that Carruthers and Teresa's friend, Mrs. Staley, were named as coowners of bank accounts with her. The record makes it clear that there was no foundation for any of these opinions. The plaintiff Anson gave similar conclusionary testimony.

John Blodig, M.D., a practicing psychiatrist and an assistant clinical professor at the Creighton University School of Medicine, was called by the plaintiffs as an expert witness. He listened to the tape recording of the conversation between Teresa and Wolpert. He testified as to persuasive techniques he believed were used by Wolpert, and: "My opinion is that yes, this lady

could be influenced and just as any person could be. There is no person who is beyond influence so she could be. . . . Q. . . . was [she] a person who could be influenced to a significant degree by the type of conversation presented by the recording . . . between Teresa Murphy and Father Wolpert? . . . (A.) Yes. . . . No. I did not mean to imply that in any way she was being overpowered. The term I'm using is influenced. . . . Q. Would you say that you are using it in the sense that Teresa Murphy was—her will was overpowered by reason of this influence? A. No."

We now turn to the tape recording. We can set forth only the general nature of the conversation, together with some illustrative excerpts. Two witnesses brought to Teresa's home by Wolpert were present. The conversation began informally about some old furniture in the room. Wolpert then informed Teresa of the inquiries he had from the Bishop's representative. The following excerpts are illustrative. The explanatory matter in brackets we have inserted.

"FATHER WOLPERT: —which I have here now [referring to the copies of the deeds which he had brought with him]. It does not appear that Teresa actually examined the deeds on that occasion.] And the good Msgr. said, —well, I explained then to him what had happened.

"MISS MURPHY: Yes.

"FATHER WOLPERT: —that a number of years ago, and I don't know how long ago, you made a Will and in this Will you were disposing of your estate in favor of the Church over at West Point, or over at Lyons—

"MISS MURPHY: Uh-huh.

"FATHER WOLPERT: —and occasionally you would mention this to me, and then on occasion you also mentioned to me that you were not sure you had everything in the Will exactly the way you wanted it.

"MISS MURPHY: No, surely.

"FATHER WOLPERT: And so—at one point then you made the decision that you would like to dispose of it to make sure it would get where it belonged and that you would be taken care of and that George would be taken care of—

"MISS MURPHY: Yes, that's what I want.

"FATHER WOLPERT: —and that is the reason for these deeds. . . . [Reading from the Bishop's letter to Guill et al.] 'Your letter has given me my first knowledge of this matter and it does not appear to me that your Archbishop can be concerned with the way Teresa Murphy disposes of her property. If you are not satisfied I think you should take the matter up with her—'

"MISS MURPHY: I wish they would. . . . [Later the letter from Guill and Crawford was read in part.]

"FATHER WOLPERT: All right. Well, now, it's dated July 19, 1962, 'Archbishop Gerald T. Bergan, 2507 Cass Street, Omaha, Nebraska. Dear Archbishop Bergan: After ninety days hesitation and with deep regret, we feel that we must bring our problem to your attention. We sought legal advice on this matter and were advised to first contact you to show you our problem and save undesirable comments. The problem is this: Our Aunt Teresa Murphy, who is eighty-one years old and infirm, —'

"MISS MURPHY: I am not eighty-one, thank you.

"FATHER WOLPERT: How about infirm? (Laughing)

"MISS MURPHY: Fine. (Laughing)

"FATHER WOLPERT: '—suffered a stroke on the 4th day of February, 1962, was taken to the Onawa, Iowa Hospital and a short time later was transferred to a rest home in Onawa in which Dr. P. L. Wolpert has an interest, and while at this rest home something must have happened which caused her to make out deeds to most of the land, which rightfully belonged to four legal heirs, two nieces and two nephews—'

"MISS MURPHY: How did it rightfully belong to

them when it was a Supreme Court decision that it was mine? Ha.

"FATHER WOLPERT: Well, she mentions then who they are, 'Fern Anson, Marguerite Crawford, George Carruthers and Tim Crawford.'

"MISS MURPHY: Uh-huh.

"FATHER WOLPERT: '—who were not consulted when this took place.'

"MISS MURPHY: Oh dear (laughing). After putting $11,000 down the drain on a lawsuit, I think I bought it, as well as having it given to me. . . .

"FATHER WOLPERT: Well, so they go on: 'The land, 160 acres, was deeded to Father Leo A. Wolpert of the Lyons, Nebraska parish, and one 160 acres to the St. Joseph Catholic Church of Lyons and later another 80 acres was deeded the same way.'

"MISS MURPHY: That I bought and paid for.

"FATHER WOLPERT: 'This aunt is a single lady and all of our mothers were her sisters. It was always intended that this property should pass down to the legal heirs after the life time use—'

"MISS MURPHY: No, there never was said a word— I'm sorry before God. There was never a word mentioned only of George Carruthers for this till he died. That was really the way, and then it was to go for Masses for the dead after we're all gone. That's why I—no, I—you know the Church as I said, don't say Masses. It's the Priest. Go on, Father, excuse me.

"FATHER WOLPERT: Well, so I'll repeat what she said: 'It was always intended—'

"MISS MURPHY: No.

"FATHER WOLPERT: '—that this property should be passed on to the legal heirs after the lifetime use by the uncles and aunts.'

"MISS MURPHY: How was she going to prove that?" The balance of the letter was read, interrupted by various interjections by Teresa similar in vein, includ-

ing references to the 1946 litigation, and a conversation with her lawyer at that time:

"MISS MURPHY: Yes, he wanted me to. He said, 'Teresa, I know you don't want to go to court,' and I said, 'No, I have never had to and I don't want to.' But, I said, 'I can if I have to.' 'Well,' he said, 'Let's put on a labor bill.' He said, 'This whole thing wouldn't pay for it after 45 years.' I said, 'Oh no,' I said, 'if they can take it from me legally they can have it.' 'But,' I said, 'I'm not charging anybody for what I've done.' He said, 'All right, Teresa. That's all right.'

"FATHER WOLPERT: So in other words, you went to court—

"MISS MURPHY: You know, I wouldn't have to give anybody a nickel. Babe [Carruthers' nickname] nor anybody else. Only they said to give this—that was a verbal contract with the two brothers and the sister, and Mary first said she'd like it to go to Father Flanagan's for Masses and George and Bryan said, 'No,' that they were becoming self-supporting and leave it so it would be—the Masses would be in Lyons. Because I know when I'm gone, I might be a poor Catholic, but there won't be no more Masses. You know people."

Later there were references to what was apparently the execution of the 1959 will.

"MISS MURPHY: You know you and Mr. and Mrs. Heinzman and I went down to Mr. Dea's. Isn't it five or six years ago? . . .

"FATHER WOLPERT: So you haven't changed your mind one bit for at least 5 or 6 years? [The actual elapse of time was about 3 years.]

"MISS MURPHY: Not one bit. But I never would either. No. I never would. If they want a court fight, they can have it. I'm ready."

Plaintiffs point out the discrepancy between the 1959 will and the deed dispositions as evidence of confusion on the part of Teresa.

Later the conversation turned to a conversation that Teresa apparently had with her brother, George Murphy, during his lifetime. This led to further discussion about the interest Carruthers took by the deed. Carruthers, of course, was still living at the time of this conversation. "MISS MURPHY: Oh, no, no. It was life estate and that's the same. He has that till he dies."

The principal position of the plaintiffs is that because of the confidential relationship existing between Wolpert as Pastor and Teresa as parishioner, a presumption arises that the deeds were procured as the result of undue influence and are therefore presumptively invalid; that the burden was upon the defendant Wolpert to produce evidence to overcome that burden and that he has not done so. Plaintiffs also take the position that Teresa did not know the nature and effect of the deeds; that the making of the deeds was improvident and without an opportunity for independent advice; and that these things, together with the presumption of undue influence, require the deeds be set aside.

The defendants argue that any presumption which may have arisen has been clearly overcome by (1) evidence of a long-standing plan for disposition of the property which involved Carruthers, the Catholic Church, and its priests; (2) the family estrangement which eliminates the plaintiffs and Crawford as natural objects of Teresa's bounty; (3) independent evidence such as the statements of Teresa in the taped conversation and her later letter of August 21, 1967; and (4) evidence that Teresa did know the nature and effect of the deeds and that it was her voluntary and knowing act. The plaintiffs counter with the argument that the subsequent acts are the continuing result of undue influence. They argue that Dea was doing Wolpert's bidding rather than Teresa's. We find that the evidence does not support that conclusion.

The following principles are applicable: "A case

of undue influence is made out, in the case of a deed, where it is shown by clear and satisfactory evidence (1) that the grantor was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; and (4) that the result appears to be the effect of such influence. . . . The undue influence which will avoid a deed is an unlawful or fraudulent influence which controls the will of the grantor." Eggert v. Schroeder, 158 Neb. 65, 62 N. W. 2d 266. See, also, Blochowitz v. Blochowitz, 122 Neb. 385, 240 N. W. 586, 82 A. L. R. 949.

"The one attacking an instrument on the ground that its execution was procured by undue influence has the burden resting on him to establish that fact. However, the circumstances under which it was made, the condition of the grantor at the time, and the injustice to her and her heirs, if it is upheld, may be such as to cast upon the grantee the burden of going forward with the evidence to show that it is not tainted with undue influence but is the deliberate and bona fide act of the grantor." Conry v. Langdon, 181 Neb. 53, 146 N. W. 2d 782.

"It is impossible to lay down any hard and fast rule in cases of this kind as to when a presumption of undue influence arises. The rule must, of necessity, be applied according to the particular facts and circumstances of each case in which the question arises. Generally, it may be said that if the facts and circumstances show such confidential, fiduciary, or trust relationship that it would be inequitable to sustain the deed in question, then such presumption arises, and the burden of going forward with the evidence rests upon the grantee to show the bona fides thereof. Kucaba v. Kucaba, 146 Neb. 116, 18 N. W. 2d 645." Cunningham v. Quinlan, 178 Neb. 687, 134 N. W. 2d 822. See, also, Gaeth v. Newman, 188 Neb. 756, 199 N. W. 2d 396.

"Where the validity of an alleged gift between persons occupying a confidential relationship is attacked, the

burden of proving that a confidential relationship existed between the parties rests on the one attacking the gift. . . . Generally speaking, any presumption of undue influence may be rebutted by competent and sufficient evidence. . . . The mere existence of a confidential relationship between grantor and grantee does not of itself show undue influence . . . where the deed is made by the grantor with full knowledge of its nature and effect, and because of the deliberate desire of the grantor." Gaeth v. Newman, *supra*.

The court, in examining the matter of whether a deed was procured by undue influence, is not concerned with the rightness of the conveyance, but only to determine whether it was the voluntary act of the grantor. The fact that the grantor has others who were so related to him who were proper subjects to receive his bounty can be considered by the court only as it bears upon the validity of the conveyance. See Broeker v. Day, 124 Neb. 316, 246 N. W. 490.

It is clear from the evidence we have set forth that a confidential relationship within the meaning of our previous holdings did exist between Wolpert and Teresa. It is acknowledged that she reposed trust and confidence in him. Although details are lacking, she did at some point and to some degree discuss with him the disposition of her property. These circumstances placed upon the defendants the burden of going forward (although not changing the burden of proof) with evidence to show that the conveyances were the deliberate acts of the grantor. We conclude that the defendants have carried the burden cast upon them by the foregoing rule and that the deeds were not the result of undue influence.

The following considerations are persuasive: (1) A purpose to benefit the Catholic Church and to assure the saying of masses for the deceased members of the family, after making provision for the security of Carruthers during his lifetime, had its origin in the minds of Teresa and her unmarried brothers and sisters long

before Wolpert was known to Teresa. (2) The evidence clearly supports the position that Teresa did not intend that Guill, Anson, and Crawford benefit from her estate. (3) The spontaneous interjections of Teresa as Wolpert read to her the letter from her niece and nephew to the Bishop and the Bishop's response clearly demonstrate that the intention continued. (4) The letter of August 21, 1967, affirms her continued purpose that the church and Wolpert receive the property after her death and the death of Carruthers. The plaintiffs imply that Wolpert is responsible for this letter, but there is no evidence whatever to sustain the implication. Wolpert testified he did not prepare it nor type it and does not know who did, and that the receipt of the letter was unexpected by him. The letter itself indicates that it was impelled by some recent act of her relatives. (5) The expert testimony of Dr. Blodig, upon which the plaintiffs rely, supports the proposition that such acts as may be attributed to Wolpert did not overpower the will of Teresa so that she did something she did not want to do. (6) The correspondence between Dea and Teresa did not make any secret of the fact that Wolpert had talked to Dea. The fact the deeds themselves were promptly recorded at Teresa's direction evidences the lack of secrecy. (7) The record demonstrates that Teresa did know the nature and effect of the deeds. There is in the record evidence of statements by her that she considered her needs small and that the income from the real estate, along with her personal property, was sufficient for her purposes. She was mistaken, of course, by reason of the circumstance of her exceptionally long life and her ultimate total incapacitation. It is evident that she assumed she would not outlive Carruthers. We, however, must view the matter as the grantor apparently saw it at the time she executed the deeds. (8) There is no evidence of any kind to support the position that Teresa was in a weakened condition of mind or body when the deeds were executed. People

824

who dealt with her in business matters affirmatively testified as to her mental capacity. An employee of the rest home where she was for a period of weeks following the 1962 illness testified that Teresa's mental and physical condition was so good that the witness wondered why she was there.

The plaintiffs rely upon cases from other jurisdictions which either do not conform to our law, or which would if followed establish a rule sui generis in cases of alleged undue influence where the grantee is a church or a clergyman. They cite Corporation of Latter-Day Saints v. Watson, 25 Utah 45, 69 P. 531; Corrigan v. Pironi, 48 N. J. Eq. 607, 23 A. 355; Finegan v. Theisen, 92 Mich. 173, 52 N. W. 619; and Coughlin v. St. Patrick's Church of Tama, 201 Iowa 1268, 209 N. W. 426.

The decree of the court in No. 39262 is reversed and the cause remanded with directions to enter judgment for the defendant. The decree of the court in No. 39284 is affirmed so far as the deed of March 20, 1962, is concerned, and reversed insofar as the deed of May 17, 1962, is concerned, and the cause remanded to the trial court with directions to enter judgment for the defendant.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.