GENEVIEVE HENRICKSON, APPELLANT, V. EUGENE W. DOOLEY, APPELLEE.

227 N. W. 2d 613

Filed April 10, 1975. No. 39815.

Lyle B. Gill, for appellant.

Burbridge & Burbridge and Deutsch & Hagen, for appellee.

Heard before SPENCER, NEWTON, CLINTON, and BRODKEY, JJ., and WARREN, District Judge.

CLINTON, J.

This is an action in equity to set aside two deeds, the execution and delivery of which is alleged to have been obtained by the exercise of undue influence and duress upon the plaintiff grantor, Genevieve Henrickson, by the defendant grantee, Eugene W. Dooley. Each deed reserved to the grantor a life estate in the property therein described. The trial judge found that the plaintiff had failed to sustain her burden of proving that the conveyances were the result of undue influence and duress and denied the relief prayed for. We affirm.

The evidence received and upon which the trial judge based his findings is conflicting in some material respects. Although this matter in equity is triable de

novo here, we are assisted by the principle that when credible evidence on material questions of fact is in conflict, the reviewing court will consider the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the other. Shirk v. Schmunk, 192 Neb. 25, 218 N. W. 2d 433.

A detailed recital of all the evidence would serve no useful purpose. We simply state such of the background as is useful to an understanding of the situation and then set forth in a somewhat conclusory way the possible factual determinations and inferences which may be deduced from each party's version of the events involved.

Plaintiff, aged 63, and the defendant, aged 48, are cousins. Plaintiff never married, had been diabetic most of her life, and blind for about 15 years, and also suffered from asthma. She lived with her parents until their deaths and thereafter lived principally with relatives. She received by way of inheritance or deed from her parents two contiguous tracts of farmland and a residence in the town of Wausa. In 1971 she was living with the defendant's parents, Mr. and Mrs. Wesley Dooley. While living there, Mrs. Dooley administered plaintiff's insulin shots and prepared her special diabetic diet. Wesley Dooley died in December of 1971 and thereafter Mrs. Dooley and the plaintiff moved from the Dooley home to the residence owned by the plaintiff. In 1972 because of failing eyesight and an unsteady hand, Mrs. Dooley found it difficult to care for the plaintiff. At that time the defendant and his family, consisting of his wife and six children, were living upon a 120-acre tract of farmland belonging to the plaintiff which the defendant leased from her and which is one of the tracts involved in this action. Because of the elder Mrs. Dooley's problems in administering the insulin injections, plaintiff arranged for the defendant's wife, Marguerite, to come 6 miles from the farm to give these ministrations

daily. The arrangement continued for only a brief time as on some occasions defendant's wife was unable to make the trip. In January 1972 the plaintiff moved in with the defendant and his family although defendant and his wife were reluctant to have her do so, the house being inadequate because, among other reasons, it had only three bedrooms. Nonetheless the plaintiff moved in and brought with her a reclining chair and used this as her bed. Thereafter Marguerite prepared the plaintiff's special diabetic meals and injected the insulin and performed other services for which the plaintiff paid her $100 per month. After the plaintiff came to live with the defendant and his family, she terminated the farm lease on another 160-acre tract of farmland which she owned and leased it to the defendant. This second tract is described in one of the deeds. In September of 1972 because of the poor corn crop the defendant's wife contemplated getting a job and told the plaintiff that they might not be able to keep her any longer. The plaintiff then offered to pay $150 a month if the defendant's wife would continue to take care of her. This was done.

If the trial court had accepted the plaintiff's version of events which led to the execution of the deeds, he could have concluded as follows: In the spring of 1972 the defendant and his wife let the plaintiff know that they wanted her land when she died; that the defendant told one of his brothers that he expected "to get something out of this." In order to accomplish the purpose of inheriting plaintiff's land the Dooleys put pressure on the plaintiff by threatening to put her in a rest home and not to take care of her. They mistreated her in other ways. They suggested that a real estate man be called to make a will for the plaintiff. The plaintiff refused to have it done in this way but wanted a lawyer to do it. Finally in June of 1973 the plaintiff yielded to the importunations of the defendant and his wife and dictated to the defendant what is referred to as a "will."

This instrument was received in evidence, and its authenticity is not in dispute. While it is in part illegible, parts having been marked out apparently at the time of dictation, it appears to contemplate that the defendant "take care of [plaintiff] through all sickness to the time of death and internment. . . . Without pay for services Rendered." It names "Eugene W. Dooley, Heir, to all the land . . . that I own at the time of my death." It was unsigned. After the dictation of this instrument, the plaintiff had the defendant's wife take her to the office of a lawyer plaintiff had chosen. Neither the plaintiff nor the Dooleys had any previous acquaintance with the attorney. However the attorney's father, also a lawyer, had handled the probate of the estates of the plaintiff's parents and his name was thus known to her. This lawyer, Paul Robinson, was not in his office when the plaintiff arrived as they had made no appointment. Nonetheless the plaintiff left instructions with the lawyer's secretary. The plaintiff's testimony was as follows: "Q When you went to the office was Paul Robinson there? A No, his secretary was there and I told her what I wanted. Q Did you know her? A No, I told her I wanted the will copied and then I wanted the deeds made out. Q So you left the paper with Paul Robinson's secretary? A Yes." At that time the plaintiff left with Robinson's secretary the "will" and the deeds by which she had acquired the land from her parents. She told Robinson's secretary that she wanted Eugene Dooley's name on the deeds. The plaintiff's version of what occurred next is that, although she had no interim contact with Robinson whatever, she was later advised by him that the instruments were ready. The Dooleys then took her to the lawyer's office where the deeds in question and a will, naming the defendant as the beneficiary of plaintiff's estate, were presented to the plaintiff for signature. The plaintiff protested that the deeds were not made out the way she wanted, but that she signed them anyway when she interpreted remarks of defendant and

his wife to mean that they would walk out of the lawyer's office and leave her there if she did not sign them. After plaintiff executed the deeds, she paid Robinson for his services and took the deeds to the courthouse and caused them to be recorded, paying the filing fees and the documentary stamp costs by check.

As already noted, the trial court accepted the defendant's version of facts from which, insofar as that version differs from that of the plaintiff, the court could have concluded as follows: While the plaintiff was still living with the defendant's parents she came to him and urged him to lease the 120-acre tract of land, which he did. "She told me if I were to stay on the farm, take care of it and live there that one day that farm would belong to me." The defendant's wife, Marguerite, testified that, after some occasions when bad roads prevented her traveling to Wausa to administer plaintiff's insulin, the plaintiff proposed that she come to live with them. Marguerite testified: "I told her I had six children and the house really wasn't a very fit place to live and I didn't think that would work out. Q What did she say that she would do? A She said she didn't want to go to a nursing home and that she would enjoy very much living with us. She liked children and she said I'm coming over." The defendant and his family took care of the plaintiff and did not mistreat her, except that on one occasion the defendant's wife slapped the plaintiff out of sheer frustration when the plaintiff refused to respond to repeated inquiries as to whether she had taken her pills. This action defendant's wife immediately regretted, made apology, and attempted to make amends. On only one occasion was it suggested that plaintiff go to a rest home to live and that only as a temporary expedient because defendant's wife was ill. Another suggested alternative was temporarily living with other relatives.

Neither the defendant nor his wife suggested that the plaintiff see an attorney. This was her idea. They did

not know the attorney in question. That, contrary to the plaintiff's version, three trips were made to the attorney's office. The first was as described by the plaintiff. On the second occasion the plaintiff went to the attorney's office at his suggestion and pursuant to appointment. Both defendant and his wife accompanied her at that time. On this occasion various possible ways of accomplishing the plaintiff's purposes were discussed by the plaintiff and Robinson and agreed upon. Later the instruments were prepared. When that had been done the plaintiff went in a third time in order to execute them. On both occasions the full significance of the instruments was explained by Robinson and plaintiff fully understood their effect. At one point during the last conference the plaintiff became agitated and uncertain. Robinson then told her that he would not let her sign the instruments unless she understood them and desired their execution. After further explanation and discussion, plaintiff executed the instruments. Based upon Robinson's testimony the court could have concluded the plaintiff knew that under the deeds she would receive the income for life, but could not sell or mortgage the land without the joinder of the defendant; that this is what she fully intended to do when she executed the instruments; and that the motivations for the disposition were to avoid a fight over her property after her death and apparently to induce the defendant and his wife to give her a home. There can be from the evidence no suggestion whatever that the defendant and his wife communicated with Robinson except in the plaintiff's presence and there is no support for any inference that they participated in the discussions or the decision as to how the plaintiff's intentions should be implemented. About a month after the deeds were recorded on June 15, 1973, the plaintiff went to visit other relatives. She did not return to live with the defendant thereafter, and without further contact commenced this action. She also caused to be served upon the defendant

an eviction notice with which he complied. The trial court could conclude that after she left the defendant's home she changed her mind and sought to avoid what she had done.

The general legal principles applicable to the determinations of controversies of this type have been stated by this court on numerous occasions. The most recent statement was in Guill v. Wolpert, 191 Neb. 805, 218 N. W. 2d 224. We will not reiterate those propositions here.

AFFIRMED.